Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000556
30-JUN-2014
09:20 AM

NO. CAAP-11-0000556

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

DAVID PANOKE, Claimant-Appellant, v.
REEF DEVELOPMENT and SEABRIGHT INSURANCE,
Employer/Insurance Carrier-Appellee,

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2005-243 (NO. 2-04-07185))

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

Claimant-Appellant David Panoke (**Panoke**) appeals from a Labor and Industrial Relations Appeals Board (**LIRAB**) June 14, 2011 Decision and Order that affirms in part, reverses in part, and modifies in part the Director of Labor and Industrial Relations' (**the Director**) decisions regarding Panoke's claim for workers' compensation benefits from Employer-Appellee Reef Development of Hawaii, Inc. (**Reef Development**) and Insurance Carrier-Appellee Seabright Insurance Company (**Seabright Insurance**).

Panoke raises several points of error on appeal, arguing that the LIRAB erred:

(1) in its Finding of Fact (**FOF**) that the work accident did not aggravate or accelerate Panoke's bilateral

shoulder conditions, that Panoke would have experienced immediate symptoms, that Panoke's argument that the shoulder symptoms were masked by his low back injury is inconsistent with the report of knee symptoms, and that Panoke's shoulder conditions are inconsistent with a traction type mechanism of injury;

(2) as a matter of law in Conclusion of Law (**COL**) 1 that Panoke did not sustain injuries to his shoulders at work and that Reef Development rebutted the presumption of compensability;

(3) as a matter of law in COL 1 by refusing to consider any argument that Panoke's injury involved cumulative trauma;

(4) as a matter of law in COL 2 by limiting temporary total disability (**TTD**) to 6/20/2004 - 6/22/2004, 6/30/2004 - 12/17/2005, and 4/11/2006 - 5/11/2006;

(5) as a matter of law in COL 2 by requiring that certifications of disability be contemporaneous, in writing, include the date of the accident, and that they mention the condition for which the disability is certified; similarly, the LIRAB further erred in holding that descriptions such as "off work" or that a claimant is "significantly impaired" are insufficient as a certification of disability without a statement that such impairment or disability is due to the work injury;

(6) in COL 2 by holding that the record did not include statements of certification that Panoke was temporarily and totally disabled due to a work injury;

(7) as a matter of law in COL 3 that Reef Development was not liable for a late payment of TTD benefits and that there was no evidence that the payments were untimely;

2

(8)   as a matter of law in COL 3 that except for the period 4/11/2006 - 5/11/2006, Claimant was not entitled to TTD benefits after 12/17/2005; and

(9)   as a matter of law in holding that Panoke was not entitled to treatment with Dr. Loos for chronic pain.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced, applicable authorities, and the issues raised by the parties, we resolve Panoke's points of error as follows:

(1 & 2)   Hawaiʻi workers' compensation law contains a strong presumption in favor of employee claims.  Hawaii Revised Statutes (**HRS**) § 386-85 (1993),[1] states that for all workers' compensation claims "it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury."  This places a "heavy burden" on the employer, imposing "the burden of going forward with the evidence and the burden of persuasion."  Van Ness v. State of Haw., Dep't Of Educ., 131 Hawaiʻi 545, 558, 319 P.3d 464, 477 (2014) (citing Lawhead v. United Air Lines, 59 Haw. 551, 559, 584 P.2d 119, 124 (1978) and Akamine v. Hawaiian Packing & Crating Co., 53 Haw.

---

[1]   HRS § 386-85 states the following:

**§ 386-85 Presumptions.**  In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:
(1)   That the claim is for a covered work injury;
(2)   That sufficient notice of such injury has been given;
(3)   That the injury was not caused by the intoxication of the injured employee; and
(4)   That the injury was not caused by the wilful intention of the injured employee to injure oneself or another.

3

406, 408, 495 P.2d 1164, 1166 (1972)).

"In order to overcome the HRS § 386-85(1) presumption of work-relatedness, the employer must introduce substantial evidence to the contrary"; in other words, substantial evidence that the injury does not relate to the employment. Igawa v. Koa House Rest., 97 Hawai'i 402, 407, 38 P.3d 570, 575 (2001). "The term substantial evidence signifies a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected." Id. (citations and internal quotation marks omitted). If the employer is unable to produce this "substantial evidence," then the presumption requires that the claimant prevail. Van Ness, 131 Hawai'i at 558, 319 P.3d at 477; Akamine, 53 Haw. at 409, 495 P.2d at 1166. If, however, the "trier of fact determines that the employer has adduced substantial evidence to overcome the presumption, it must weigh the evidence elicited by the employer against the evidence elicited by the claimant." Igawa, 97 Hawai'i at 409, 38 P.3d at 577 (citation omitted). Additionally, given the "humanitarian" nature of the workers' compensation law, the supreme court has liberally construed HRS § 386-85 and "requires that all reasonable doubts be resolved in favor of the claimant." See Van Ness 131 Hawai'i at 558, 319 P.3d at 447 (citations omitted). Thus, "if there is reasonable doubt as to whether an injury is work-connected, the . . . statute demands that doubt be resolved in favor of the claimant." Akamine, 53 Haw. at 409, 495 P.2d at 1166.

As the Hawai'i Supreme Court noted in Van Ness, when

"determining the compensability of injuries 'by accident'" (as is true in the instant case, where Panoke cites to the June 2004 accident as the source of his injuries), one must use the "unitary" or "nexus" test. Van Ness, 131 Hawai'i at 560, 319 P.3d at 479. This unitary test "considers whether there is a sufficient work connection to bring the accident within the scope of the statute, and requires the finding of a causal connection between the injury and any incidents or conditions of employment." Id. at 560, 319 P.3d at 479 (citation and internal quotation marks omitted). Appellate courts must also keep in mind that, when reviewing a LIRAB decision on the issue of compensability, deference should be given to the LIRAB's assessment of witness credibility and evidentiary weight. Moi v. State, Dep't of Pub. Safety, 118 Hawai'i 239, 242, 188 P.3d 753, 756 (App. 2008); see Nakamura v. State, 98 Hawai'i 263, 268, 47 P.3d 730, 735 (2002); Igawa, 97 Hawai'i at 409-10, 38 P.3d at 577-78.

Panoke asserts that the LIRAB erred in its COL 1 that he did not sustain injuries to his shoulders at work and that Reef Development rebutted the presumption of compensability. We start with the presumption that Panoke's claim for shoulder injuries is a covered work injury and then examine the record to determine if Reef Development was able to meet its heavy burden of providing substantial evidence to overcome the presumption. HRS § 386-85(1); Van Ness, 131 Hawai'i at 558, 319 P.3d at 477.

In examining the record, it appears that there was sufficient evidence to overcome the presumption that Panoke's shoulder injuries were work injuries. Three physicians (Drs.

5

Agles, Lau, and Diamond) each independently concluded that the shoulder condition was not (or, at least, not likely) due to the industrial accident. The physicians gave clear and well-articulated answers as to why Panoke's bilateral shoulder condition was unrelated to the work incident. For instance, Dr. Agles cited a litany of reasons, including the following: the "lack of documentation of shoulder involvement initially"; a "history of prior severe trauma to the shoulders requiring hospitalization"; Panoke's inability to explain how the right shoulder was injured in the accident; Panoke's subjective complaints being "out of proportion to the objective findings"; and possible "drug-seeking behavior." The other physicians, Dr. Lau and Dr. Diamond, gave similar reasons. Additionally, Dr. Diamond conducted an analysis of Panoke's MRI arthrograms for his shoulder and concluded that the arthrograms revealed injuries of a longstanding, degenerative nature; he stated that he did not think that the shoulder conditions related to the work accident. Dr. Diamond found that the mechanism of Panoke's injury was not typical of the shoulder pathology found because a superior labrum injury usually involves a compressive mechanism, such as seen in overhead throwing, rather than a traction mechanism, as in this case. He also noted that, "[i]n rare cases where traction mechanism is implicated, [superior labrum] lesions usually involve a biceps avulsion, as well as other pathology, and that Dr. Okamura had specifically noted that Panoke's biceps tendon was normal. Dr. Diamond admitted that it was possible that the work injury accelerated the shoulder conditions (essentially that it was within the realm of possibilities, however remote), but

concluded that it was not probable.  These medical opinions constituted a "high quantum of evidence," which was "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that [Panoke's shoulder] injury . . . [wa]s not work connected."  See Igawa, 97 Hawai'i at 407, 38 P.3d at 575 (citations and internal quotation marks omitted).

We reject Panoke's argument that these were "generalized opinions."  See Akamine, 53 Haw. 406, 495 P.2d 1164; Korsak v. Hawaii Permanente Med. Grp., 94 Hawai'i 297, 308, 12 P.3d 1238, 1249 (2000); Nakamura, 98 Hawai'i at 269, 47 P.3d at 736.  Despite Panoke's contentions otherwise, there was consideration of whether the work injury could have aggravated Panoke's pre-existing shoulder condition.  Dr. Diamond testified as to this issue, replying "[n]o" to a question about whether it was probable that the "industrial accident aggravated or accelerated [Panoke's] preexisting degenerative condition."  He based this answer, in part at least, on the "mechanism of injury," the fact that the shoulder symptoms did not appear until weeks after the industrial accident, and because the MRI results showed that the tears were "longstanding" in nature.  Moreover, the physicians' expert opinions in the present case, as in Nakamura, "did more than opine generally that [claimant] had an illness predating his employment."  See Nakamura, 98 Hawai'i at 269, 47 P.3d at 736.  Rather, the medical reports identified specific reasons as to why the shoulder injuries were not work related and why the industrial accident did not exacerbate Panoke's pre-existing condition.

7

The final step in the analysis is "weigh[ing] the evidence elicited by [Reef Development] against the evidence elicited by [Panoke]," keeping in mind that reasonable doubts should be resolved in Panoke's favor. Igawa, 97 Hawai'i at 409, 38 P.3d at 577 (citation omitted); see also Van Ness, 131 Hawai'i at 558-59, 319 P.3d at 477-78. One piece of evidence favorable to Panoke is encompassed in a statement by Dr. McCaffrey, Panoke's attending physician, who wrote in a January 31, 2005 letter that:

> [T]here is no evidence nor reason to hypothesize a pre-existing condition. It is noted that the patient did have a decade old injury to his shoulders. However, he has been involved in heavy work activities as well as recreational pursuits and was clinically asymptomatic prior to the June 17, 2004 work-related accident.

Dr. Okamura also responded affirmatively to a letter asking him whether the June 2004 incident caused or aggravated Panoke's shoulder condition, but he did not specify whether it was a direct cause or simply an aggravation, even though in an earlier WC-2 Physician's Report he marked a box indicating that the accident was the only cause of Panoke's condition. However, these statements by Drs. McCaffrey and Okamura were made before the MRI arthrograms were conducted on Panoke's shoulders, and there was evidence of a pre-existing condition, as revealed by Dr. Diamond's analysis of the MRI arthrograms in which he explained how they showed a process of long-term degeneration in the shoulders. There was also controversy over Dr. Okamura's work-relatedness opinion because that opinion was based (at least in part) on an July 2, 2004 pain diagram that was apparently altered in the shoulder region.

In sum, considering all of the evidence presented by

8

both Reef Development and Panoke regarding work-relatedness, as well as the § 386-85(1) presumption and that all reasonable doubts should be resolved in favor of Panoke, this court concludes that the LIRAB did not err in its COL 1 that Reef Development rebutted the presumption of compensability and that Panoke's shoulder injuries were not work related. Reef Development produced a high quantum of evidence through the testimony and reports of various independent physicians, outweighing the evidence that Panoke presented in both quantity and quality. Therefore, the LIRAB's COL 1 ruling regarding Panoke's shoulder injuries was not error as a matter of law.

(3) Citing Baldauf v. AOAO Regency Park, No. 28646 (Haw. App. June 25, 2009) (mem.), Panoke contends that the LIRAB erred as a matter of law in COL 1 by rejecting the argument that his injury involved cumulative trauma. Baldauf is distinguishable. In Baldauf, this court reasoned that "a theory of cumulative trauma can reasonably be inferred as existing within Baldauf's initial claim"; however, in the present case, no such reasonable inference can be made. See id. Whereas Baldauf stated "[f]rom the initiation of his claim" that he had knee pain and that the work activity had aggravated his knee condition, Panoke, in contrast, did not notice shoulder pain until weeks after the industrial accident. Id. Additionally, unlike in Baldauf, Panoke never alleged that his general work activities caused the shoulder problems (rather, his focus was solely on the June 2004 accident), and the issue of cumulative trauma was not brought up until the trial was well underway. See id. Therefore, we conclude that the LIRAB did not err in this regard.

9

(4-7) Panoke argues that the LIRAB erred in COLs 2 and 3 regarding the award of TTD benefits resulting from the June 17, 2004 work injury. First, Panoke contends that the LIRAB erred as a matter of law in its COL 2 by requiring that certifications of disability be contemporaneous, in writing, include the date of the accident, and that they mention the condition for which the disability is certified. Panoke further states that the LIRAB erred in holding that descriptions such as "off work" or that a claimant is "significantly impaired" are insufficient as a certification of disability without a statement that such impairment or disability is due to the work injury. The LIRAB made clear in its decision that these requirements were based upon the LIRAB's own interpretation of the applicable "laws and rules."

One of these laws is HRS § 386-96 (Supp. 2013),[2] which,

---

[2]     HRS § 386-96 states, in relevant part:

**§ 386-96  Reports of physicians, surgeons, and hospitals.**  (a) Any physician, surgeon, or hospital that has given any treatment or rendered any service to an injured employee shall make a report of the injury and treatment on forms prescribed by and to be obtained from the department as follows:

(1)     Within seven days after the date of first attendance or service rendered, an initial report shall be made to the department and to the employer of the injured employee in the manner prescribed by the department;

(2)     Interim reports to the same parties and in the same manner as prescribed in paragraph (1) shall be made at appropriate intervals to verify the claimant's current diagnosis and prognosis, that the information as to the nature of the examinations and treatments performed is complete, including the dates of those treatments and the results obtained within the current reporting period, the execution of all tests performed within the current reporting period and the results of the tests, whether the injured employee is improving, worsening, or if "medical stabilization" has been reached, the dates of disability, any work restrictions, and

(continued...)

10

*inter alia*, governs the reports of physicians and requires that one rendering "service to an injured employee shall make a report of the injury and treatment on forms prescribed by and to be obtained from the [Department of Labor and Industrial Relations]." "WC-2 Physician's Report" is one such form issued by the Disability Compensation Division of the Department of Labor and Industrial Relations (**DCD**), and it includes places where the physician must indicate the date of the injury, where and how the accident occurred, a specific description of the injury, causes of the claimant's condition, whether the accident resulted in a work disability, and whether the claimant is able to return to work. HRS § 386-96(a)(2) also requires that physicians report information regarding "the dates of disability, any work restrictions, and the return to work date."

---

(...continued)
the return to work date. When an injured employee is returned to full-time, regular, light, part-time, or restricted work, the attending physician shall submit a report to the employer within seven calendar days indicating the date of release to work or medical stabilization; and

(3) A final report to the same parties and in the same manner as prescribed in paragraph (1) shall be made within seven days after termination of treatment.

No physician, surgeon, or hospital that has given any treatment or rendered any service to an injured employee shall be required to provide any additional reports not otherwise mandated by this section.

(b) No claim under this chapter for medical treatment, surgical treatment, or hospital services and supplies, shall be valid and enforceable unless the reports are made as provided in this section, except that the director may excuse the failure to make the report within the prescribed period or a nonsubmission of the report when the director finds it in the best interest of justice to do so. If the director does not excuse the submission of:

(1) An initial or interim report within the time prescribed in subsection (a)(1) and (2); or

(2) A final report that is thirty days late or a nonsubmission,

the delinquent physician shall be fined not more than $250.

Accordingly, the foregoing reporting requirements were based upon statutory authority and were not error as a matter of law. See Igawa, 97 Hawai'i at 406, 38 P.3d at 574.

Nevertheless, the LIRAB's requirement that each certification of disability contains a specific statement that the impairment/disability is due to work injury is questionable. See HRS § 386-96. We note that the penalty for noncompliance under HRS § 386-96 is directed at physicians and takes the form of a minor, monetary fine. HRS § 386-96(b). Eligible claimants should not be denied benefits under Hawai'i workers' compensation law simply because their physician failed to properly word the requisite report. See Custino v. State, No. CAAP-11-0000570 (App. May 15, 2014) (mem.). In this case, however, as discussed below, the LIRAB did not err in its determination of the TTD benefits periods. Therefore, any error in LIRAB's articulation of the certification requirement is harmless error.

Panoke further asserts that the LIRAB erred as a matter of law in its COL 2 limiting TTD benefits to 6/20/2004 - 6/22/2004, 6/30/2004 - 12/17/2005, and 4/11/2006 - 5/11/2006. Panoke argues that he is entitled to TTD benefits from 6/21/2004 - 7/12/2007, rather than the more limited TTD benefits awarded by the LIRAB. He bases this contention on the clinical notes from Concentra Medical Center, as well as "WorkStar clinical notes from 6/30/2004 through 7/12/2007," which "kept [Panoke] off work."

The first period that TTD benefits were awarded was the period of 6/20/04 - 6/22/04. Although the work accident occurred on 6/17/04, the TTD was not started until 6/20/04 because of a

12

three-day waiting period that stems from HRS § 386-31(b) (Supp. 2013), which states that benefits do not include the "first three calendar days." Dr. Diaz-Ordaz, however, released Panoke to work "modified duty" starting on 6/19/04, and on 6/22/04, Reef Development notified Panoke that he was to return to work the next day. Thus, the LIRAB did not err in awarding Panoke benefits for the period of 6/20/04 - 6/22/04.

The next TTD benefits period awarded was 6/30/04 - 12/17/05. The LIRAB's decision derived, in part, from the Director's June 13, 2005 Decision, in which the Director awarded TTD benefits for the periods of 6/20/2004 - 6/22/2004 and 6/30/2004 - 4/5/2005. The benefits for this latter period started on 6/30/04 because that was the first time that Panoke visited Dr. McCaffrey, who examined Panoke and subsequently listed his work status as "[o]ff duty." The June 13, 2005 Decision awarded benefits through 4/5/05 because Reef Development terminated TTD on 4/6/05 based on a 2/15/05 IME by Dr. Lau, in which he stated that Panoke's back was only temporarily aggravated (and had been resolved) and that Panoke's shoulder was not related to the work accident.

The case was then remanded to the DCD on 6/26/06, so that the Director could determine several issues, including, inter alia, Panoke's request to compel Reef Development to pay TTD and assess penalties, and whether Panoke was entitled to treatment with Dr. Loos. The Director issued a supplemental Decision on October 13, 2006, extending TTD benefits for the period of 4/6/05 - 9/19/06. The Director based its TTD award on its own "Findings of Fact and Principles of Law," the crediting

13

of various interim reports by Dr. McCaffrey from 3/31/05 - 2/13/06, and the resumed TTD payment by Reef Development after Panoke's right shoulder surgery on 2/3/06. The supplemental Decision emphasized that additional TTD, if any, was to be paid upon medical certification.

The LIRAB, however, in its June 14, 2011 Decision and Order, then shortened the TTD period to 6/30/04 - 12/17/05, instead of through 9/19/06. The decision to shorten the period was made based on the rationale that Panoke was not entitled to TTD benefits after 12/17/05 because of the following:  the "non-compensability of the bilateral shoulder condition," "Dr. Diamond's opinion that [Panoke] had achieved maximum medical improvement and stability 18 months after the industrial accident," and based on the fact that Panoke was not in a vocational rehabilitation program. Panoke argues that he "would be entitled to TTD benefits after 12/17/2005 if he had a worsening of his condition" or "if he engaged in vocational rehabilitation services." However, he did not provide any evidence that either of these situations occurred. Based on the foregoing, the LIRAB's decision to limit TTD to the period of 6/30/04 - 12/17/05 was grounded in sufficient "credible evidence" supporting the restriction; thus, the LIRAB did not clearly err in this regard. See In re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000).

The final period that the LIRAB awarded TTD benefits for was 4/11/06 - 5/11/06. In making this decision, the LIRAB stated that "[f]or the period April 11, 2006 through May 11, 2006, the Board credits Dr. McCaffrey's Work Restriction Profile

and concludes that [Panoke] was disabled due to the June 17, 2004 work injury." Crediting Dr. McCaffrey's report was not clear error, and Panoke makes no objection to including this period for TTD. Therefore, given the reasons set forth above, as well as the deference afforded to an agency's expertise when mixed questions of law and fact are presented, we conclude that the LIRAB did not clearly err in limiting Panoke's TTD payments to the periods of 6/20/2004 - 6/22/2004, 6/30/2004 - 12/17/2005, and 4/11/2006 - 5/11/2006. See Igawa, 97 Hawai'i at 406, 38 P.3d at 574.

(8) Panoke asserts that the LIRAB erred as a matter of law in its COL 3 that Reef Development was not liable for a late payment of TTD benefits and that there was no evidence that the payments were untimely. Specifically, Panoke states that the LIRAB erred in not penalizing Reef Development for the late payments of TTD benefits for the period of 4/6/2005 - 2/2/2006. He argues that the TTD benefits should have been paid because the LIRAB denied a Motion For Stay of the payments on August 5, 2005, and he states that "[a]s of 4/26/2006, [he] had not received TTD since April 2005."

Reef Development and Seabright Insurance brought the Motion For Stay Of Payments on July 8, 2005 in order to stay the TTD benefits awarded by the Director's Decision of June 13, 2005. In that Decision, the Director awarded Panoke TTD benefits for the periods of 6/20/2004 - 6/22/2004 and 6/30/2004 - 4/5/2005. It was not until October 13, 2006 that the Director issued a supplemental Decision on the matter, which extended TTD benefits to the period of 4/6/2005 - 9/19/2006. Thus, Panoke's argument

15

that "[a]s of 4/26/2006, [he] had not received TTD since April 2005" does not entitle him to late payment penalties because TTD payments were not actually extended beyond April 2005 until October 2006. Panoke offers no evidence that Reef Development provided any late payments after the October 13, 2006 Decision, nor does he allege that the TTD benefits awarded pursuant to that Decision were late. Accordingly, we conclude the LIRAB did not err in its COL 3 that Reef Development was not liable for a penalty for late payment of TTD benefits and that there was no evidence that the payments were untimely.

(9) Panoke contends that the LIRAB erred as a matter of law in denying him treatment with Dr. Loos for chronic pain. At the outset, we note the distinction between two issues related to Panoke's claim and request for pain treatment with Dr. Loos: (1) whether Panoke is claiming that the work accident caused him to develop (or exacerbated) a pain disorder or condition, such that the disorder is now a subsequent compensable claim for a "covered work injury"; and/or (2) whether Panoke is disputing the *method* of treatment or the right to a certain *type* of treatment for injuries involving a work-related accident. The former would trigger an analysis under HRS § 386-85(1); the latter would not because it is simply addressing what treatment is due. See Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 91, 34 P.3d 16, 21 (2001) (noting that the HRS § 386-85(1) presumption "relates solely to the work-connectedness of an injury"); Korsak, 94 Hawai'i at 307, 12 P.3d at 1248 (stating that "in any proceeding on a claim for compensation due to an alleged compensable consequence of a work-related injury, HRS § 386-85

16

creates a presumption in favor of the claimant that the subsequent injury is causally related to the primary injury"); Davenport v. City & Cnty. of Honolulu, 100 Hawai'i 297, 310, 59 P.3d 932, 945 (App. 2001) (stating that "the exacerbation of a pre-existing [sic] condition that is the direct and natural result of a compensable primary injury would be a compensable subsequent injury" (citation and internal quotation marks omitted)).

In the present case, Panoke is not contending that the June 2004 work accident caused/exacerbated a pain disorder, nor is he asserting that his chronic pain is really a "subsequent injury"; rather, he is arguing that the chronic pain treatment with Dr. Loos should be included as part of his "treatment plan" for the primary injury of June 2004. Therefore, we consider whether the LIRAB erred by not including the chronic pain treatment as a necessary facet of Panoke's treatment plan. The right to medical care for injured workers in Hawai'i is set out in HRS § 386-21 (Supp. 2013), which states that "[i]mmediately after a work injury sustained by an employee and *so long as reasonably needed* the employer shall furnish to the employee all medical care, services, and supplies as the nature of the injury *requires*." HRS § 386-21(a) (emphasis added). Additionally, HRS § 386-26 (Supp. 2013) provides guidelines for administering the health care services, stating (in relevant part) the following:

> The director shall issue guidelines for the frequency of treatment and for reasonable utilization of medical care and services by health care providers that are considered necessary and appropriate under this chapter. The guidelines shall not be considered as an authoritative prescription for health care, nor shall they preclude any health care provider from drawing upon the health care provider's medical judgment and expertise in determining the most

appropriate care.

Thus, the decision as to what medical treatment is "appropriate care" involves an inquiry into what medical treatment is "required" and "reasonably needed" given the "nature of the injury," and deference is afforded to the claimant's "health care provider" to help make that determination based on their "medical judgment and expertise."  See HRS § 386-21(a); HRS § 386-26.

In examining whether the chronic pain treatment with Dr. Loos was "required" and "reasonably needed" medical treatment given the "nature of [Panoke's] injury," we note that the Director, in the October 13, 2006 supplemental Decision, decided to deny the treatment with Dr. Loos, crediting two reports in making this decision:  one written by Dr. Jon Streltzer on September 1, 2006 and one by Dr. Diamond on September 14, 2006. Dr. Streltzer's report was based on an "independent psychiatric examination" of Panoke, and in it he opined that Panoke had a "somatoform type of pain disorder in which psychological factors predominate over the physical" (something also recognized by Drs. Agles and Lau).  Dr. Streltzer stated that the treatment focus should be "on function" and that "[m]edications that have adverse effects, excessive diagnostic studies, and invasive interventions are not recommended."  Dr. Diamond's report also supported the LIRAB's decision to deny the treatment with Dr. Loos because it stated that Panoke's long-term pain management could be provided by Dr. McCaffrey, rather than a pain management specialist.

We also examine the course of treatment recommended by

18

the claimant's own "health care provider." See HRS § 386-26. In this case, Panoke's "health care provider" is Dr. McCaffrey because he is Panoke's attending physician. Dr. McCaffrey requested a consult with Dr. Loos for the purposes of obtaining an evaluation and recommendations; Reef Development authorized this request (as well as one follow-up visit). However, Dr. McCaffrey did not request ongoing treatment with Dr. Loos, thereby supporting the conclusion that such specialized chronic pain treatment was neither "require[d]" nor "reasonably needed" given the "nature of [Panoke's] injury." See HRS § 386-21(a). Therefore, we conclude that the LIRAB did not err as a matter of law in holding that Panoke was not entitled to ongoing treatment with Dr. Loos for chronic pain.

For these reasons, the LIRAB's June 14, 2011 Decision and Order is affirmed.

DATED: Honolulu, Hawai'i, June 30, 2014.

On the briefs:

Wayne H. Mukaida
for Claimant-Appellant

Presiding Judge

Colette H. Gomoto
for Employer/Insurance
 Carrier-Appellee

Associate Judge

Associate Judge